1   BINGHAM MCCUTCHEN LLP
2   Nathan J. Hochman (SBN 139137)
    nathan.hochman@bingham.com
3   Daniel A. Saunders (SBN 161051)
    daniel.saunders@bingham.com
    The Water Garden
4   Suite 2050 North
5   1601 Cloverfield Boulevard
    Santa Monica, California  90404-4082
6   Telephone:  310.907.1000
    Facsimile:  310.907.2000

7   SPERTUS, LANDES & UMHOFER, LLP
8   Matthew Donald Umhofer (SBN 206607)
    matthew@spertuslaw.com
9   1900 South Bundy Drive
    Suite 705
10  Los Angeles, California 90025
    Telephone:  310.826.4700
11  Facsimile:  310.826.4711

12  Attorneys for Defendant
    Cindy Omidi

13

14
                **UNITED STATES DISTRICT COURT**
15
                **CENTRAL DISTRICT OF CALIFORNIA**
16

17

| UNITED STATES OF AMERICA, | CASE NO. CR 13-00739-SVW |
|---|---|
| Plaintiff, | **MOTION TO COMPEL DISCOVERY; DECLARATION OF MATTHEW DONALD UMHOFER; EXHIBITS** |
| v. | |
| CINDY OMIDI, | Date:   TBD |
| Defendant. | Time:   TBD |
| | Courtroom:  6 |
| | The Honorable Stephen V. Wilson |

24

25

26

27

28

A/76226439.5

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE THAT at a time to be determined by the Court,

3    United States District Court Judge Stephen V. Wilson, defendant Cindy Omidi, by

4    and through her attorneys of record, will and hereby does move for an order

5    compelling discovery.

6         This Motion is based on this Notice of Motion and Motion; the attached

7    Memorandum of Points and Authorities, Declaration of Matthew Donald Umhofer

8    and exhibits thereto; the records and files herein; and such argument or other

9    evidence that may be presented at the time of the hearing on this motion.

10        This Motion is made following a conference of counsel pursuant to Local

11   Rule 7-3, which took place on June 27, 2014.

12
     DATED:  July 1, 2014
13

14                                     Bingham McCutchen LLP

15

16                                     By:_____/s/ Nathan J. Hochman_____
                                            Nathan J. Hochman
17                                          nathan.hochman@bingham.com
                                            Daniel A. Saunders
18                                          daniel.saunders@bingham.com

19
                                       Spertus, Landes & Umhofer, LLP
20

21

22                                     By:_____/s/ Matthew Donald Umhofer
                                            Matthew Donald Umhofer
23                                          matthew@spertuslaw.com

24                                     Attorneys for Defendant
                                       Cindy Omidi
25

26

27

28

MOTION TO COMPEL DISCOVERY CR 13-379-SVW

A/76226439.5

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................ 2

    A.     The Charges in the Indictment .......................................................... 2

    B.     The Government Resurrects a Stale and Previously Abandoned Structuring Investigation in Order to Gain Leverage on Ms. Omidi and Her Sons in a Larger Ongoing Investigation .......................................... 3

    C.     In an Effort to Beat the Statute of Limitations, the Government Hastily Indicts Ms. Omidi, Then Seals the Indictment For Pretextual Reasons While it Scrambles to Gather Evidence to Support the Stale Charge ................... 4

    D.     The Government's Arrest of Ms. Omidi and Searches of Her Home and Related Businesses ............................................................................... 7

    E.     The Overlap Between the Indictment and the Search Warrant For Ms. Omidi's Residence ........................................................................... 8

III.   ARGUMENT .............................................................................................. 11

    A.     Rule 16 and Brady Require the Disclosure of the Search Warrant Affidavit ...... 11

    B.     Grand Jury Transcripts Should Be Produced Based on a Showing of Potential Grand Jury Abuse ............................................................... 14

    C.     The Government Should Be Compelled to Comply With its Obligations Under Brady By Reviewing All Evidence in its Possession For Exculpatory Information in Advance of Trial .................................... 20

IV.    CONCLUSION ........................................................................................... 28

i

A/76226439.2

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3
**Cases**

4
Brady v. Maryland,
5
    373 U.S. 83 (1963) ...................................................................................... *passim*

6
Carriger v. Stewart,
7
    132 F.3d 463 (9th Cir. 1997) ............................................................................ 21

8
Chism v. Washington,
    661 F.3d 380 (9th Cir. 2011) ............................................................................ 12

9
Costello v. United States,
10
    350 U.S. 359 (1956) .......................................................................................... 14

11
Dennis v. United States,
    384 U.S. 855 (1966) .................................................................................... 15, 17
12
Douglas Oil Co. of Cal. v. Petrol Stops Nw.,
13
    441 U.S. 211 (1978) ............................................................................ 15, 16, 17

14
Giglio v. United States,
15
    405 U.S. 150 (1972) ............................................................... 21, 24, 25, 1

16
Kyles v. Whitley,
    514 U.S. 419 (1995) .......................................................................... 21, 23, 24
17
LaMere v. Risley,
18
    827 F.2d 622 (9th Cir. 1987) ............................................................................ 22

19
United States v. Agurs,
20
    427 U.S. 97 (1976) ............................................................................................ 20

21
United States v. Alvarez,
    86 F.3d 901 (9th Cir. 1996) ............................................................................ 22
22
United States v. Bagley,
23
    473 U.S. 667 (1985) .................................................................................... 20, 21

24
United States v. Banks,
25
    374 F. Supp. 321 (D.S.D. 1974) ...................................................................... 22

26
United States v. Basurto,
    497 F.2d 781 (9th Cir. 1974) ............................................................................ 14
27
United States v. Carona,
28
    No. SACR 06-0224 AG, 2008 WL 1970205 (C.D. Cal. May 2, 2008) ............... 16, 17, 19, 20

ii

A/76226439.2

United States v. Carter,
    313 F. Supp. 2d 921 (E.D. Wis. 2004) .................................................................. 21

United States v. Cerullo,
    2007 WL 2683799 (S.D.Cal. Sept. 7, 2007) ........................................................ 19

United States v. Di Bernardo,
    552 F. Supp. 1315 (S.D. Fla. 1982), rev'd on other grounds, 880 F.2d 1216
    (11th Cir. 1989) ................................................................................................. 19, 20

United States v. Fernandez,
    231 F.3d 1240 (9th Cir. 2000) ............................................................................... 22

United States v. Hsia,
    24 F. Supp. 2d 14 (D.D.C. 1998), rev'd in part on other grounds, 176 F.3d 517
    (D.C. Cir. 1999) ................................................................................................. 24, 26

United States v. John Doe, Inc. I,
    481 U.S. 102 (1987) ............................................................................................... 15

United States v. Liquid Sugars, Inc.,
    158 F.R.D. 466 (E.D. Cal. 1994) ............................................................... 11, 12, 13

United States v. Mahoney,
    495 F. Supp. 1270 (E.D. Pa. 1980) ........................................................................ 16

United States v. Naegele,
    474 F. Supp. 2d 9 (D.D.C. 2007) ............................................................... 17, 19, 20

United States v. Navarro-Vargas,
    408 F.3d 1184 (9th Cir. 2005) (en banc) ............................................................... 14

United States v. Plummer,
    941 F.2d 799 (9th Cir. 1991) ..................................................................... 17, 19, 20

United States v. Poindexter,
    727 F. Supp. 1470 (D.D.C. 1989) .......................................................................... 11

United States v. Price,
    566 F.3d 900 (9th Cir. 2009) ................................................................................. 11

United States v. Procter & Gamble Co.,
    356 U.S. 677 (1958) ............................................................................................... 15

United States v. Safavian,
    233 F.R.D. 12 (D.D.C. 2005) ................................................................................. 21

United States v. Salyer,
    2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) ................................................. passim

iii

A/76226439.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States v. Samango,
        607 F.2d 877 (9th Cir. 1979) ........................................................................... 16

United States v. Serubo,
        604 F.2d. 807 (3d Cir. 1979) .......................................................................... 15

United States v. Skilling,
        554 F.3d 529 (5th Cir. 2009) .......................................................................... 25

United States v. Sudikoff,
        36 F. Supp. 2d 1196 (C.D. Cal. 1999) ................................................ 11, 13, 21

United States v. Twersky,
        No. S2 92 Cr. 1082 (SWK), 1994 U.S. Dist. LEXIS 8744 (S.D.N.Y. June 29,
        1994) ........................................................................................................ 16, 19

United States v. Walczak,
        783 F.2d 852 (9th Cir. 1986) .......................................................................... 17

United States v. Williams,
        504 U.S. 36 (1992) ........................................................................................ 14

**Statutes**

18 U.S.C. § 1956 ..................................................................................................... 8

18 U.S.C. §§ 1956 & 1957 ..................................................................................... 12

31 U.S.C 5322(b) ..................................................................................................... 2

31 U.S.C. § 5324 ..................................................................................................... 2

31 U.S.C. § 5324(d)(2) ............................................................................................ 2

Bank Secrecy Act .................................................................................................... 6

Money Laundering Control Act of 1986 .............................................................. 12

**Other Authorities**

31 C.F.R. § 103.29 .................................................................................................. 6

Fed. R. Crim. P. 16(a)(1)(E)(i) ............................................................................. 11

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) .............................................. 16

Federal Rule of Criminal Procedure 16 ......................................................... 11, 13

Federal Rule of Criminal Procedure 6(e) ............................................................ 16

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

S. Rep. No. 99–433 (1986) ........................................................................ 12

U.S. Const. amend. V................................................................................. 14

United States Attorney's Manual, Title 9, Section 165 (Jan. 4, 2010) ......................................... 22

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Defendant Cindy Omidi ("Ms. Omidi") respectfully asks the Court:  (1) to compel production of the sealed search warrant affidavit for her residence, which was executed at the time of her arrest in this case on June 4, 2014; (2) to compel limited production of grand jury transcripts demonstrating whether the government presented to the grand jury sufficient evidence of an essential element of the charged offense – evidence that recently produced e-mails reveal the government was still scrambling to obtain days after the indictment; and (3) to compel the government to perform its obligation of reviewing the evidence in its possession – including all evidence seized in the June 4 searches of Ms. Omidi's residence and other locations – for Brady material in advance of trial.

Ms. Omidi is charged in a one-count indictment with structuring purchases of postal money orders five to six years ago in an effort to sidestep an obscure $3,000 reporting requirement.  The government does not contend that the money used to purchase the money orders came from an illegal source, nor does it contend that the money orders themselves were used for any illegal purpose.  Although the indictment charges a penalty enhancement based on the structuring of over $100,000 in a 12-month period, the total of all transactions alleged in the indictment is $86,800, and those transactions are spread out over more than 15 months.

The charged conduct, which (based on discovery recently received from the government) was apparently investigated and abandoned by the Postal Inspection Service in 2008 and 2009, was resurrected in 2012 as part of an apparent effort to gain leverage against Ms. Omidi and her sons in connection with an FDA investigation that was then (and remains) ongoing.  After scrambling to indict the case in October 2013 before more of the alleged conduct became time-barred by the statute of limitations, the government placed the indictment under seal for

29

A/76226439.2

seven months while it tried to gather essential evidence of the charged transactions – specifically, evidence that the money orders had been purchased with cash, as required to make the reporting requirement applicable – that it had unsuccessfully sought on the eve of indictment.  When it unsealed the indictment, the government arrested the 65-year-old Ms. Omidi at gunpoint and conducted searches of her house and several related businesses in connection with the FDA investigation, seizing a massive amount of paper and electronic data that the government has readily admitted it is incapable of reviewing for Brady material prior to trial.  The government has further refused to disclose the search warrant affidavit for Ms. Omidi's home, despite the substantial overlap between the two investigations and the government's refusal to commit to not using any of the seized evidence (or evidence derived therefrom) at the trial in this case.

By this motion, Ms. Omidi seeks to compel the government to comply with its discovery obligations so that she may receive the fair trial guaranteed to her by the United States Constitution.

## II.  STATEMENT OF FACTS

### A.  The Charges in the Indictment

The single-count indictment in this case charges Ms. Omidi with structuring purchases of postal money orders in violation of 31 U.S.C. § 5324, and seeks an enhanced statutory maximum based on such conduct's purportedly forming "part of a pattern of any illegal activity involving more than $100,000 in a 12-month period."  31 U.S.C. § 5324(d)(2); *see also* 31 U.S.C 5322(b).  The indictment, however, identifies transactions totaling only $86,800, and those transactions are spread out over more than 15 months; moreover, all but a handful of the events alleged in the indictment took place more than five years ago (between August and December 2008), with the last alleged transaction occurring in November 2009.

The government has conceded that it will not be suggesting at trial that the

2

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

source of the funds used to purchase the postal money orders was illegal or illicit; rather, in a neat bit of bootstrapping, the government maintains that the "pattern of illegal activity" forming the basis for the enhancement is the alleged structuring itself.  The government has further agreed that it will not be claiming that the money orders were used for an illegal purpose; most of them were deposited into the bank account of Pacific West Dermatology, a business with which Ms. Omidi is associated.  Some of those deposits aggregated the money orders into totals exceeding $10,000, which not only explains why the government did not charge the far more common structuring statute involving bank Currency Transaction Reports, but also significantly negates any intent on Ms. Omidi's part to evade reporting requirements.

**B.     The Government Resurrects a Stale and Previously Abandoned Structuring Investigation in Order to Gain Leverage on Ms. Omidi and Her Sons in a Larger Ongoing Investigation**

The explanation for why the government has now chosen to indict Ms. Omidi on an obscure postal money order structuring charge falling mostly outside the statute of limitations lies in the fact that the Food and Drug Administration ("FDA") has been investigating Ms. Omidi and her sons since at least 2012 for conspiracy health care fraud, tax violations, money laundering, and other offenses. Indeed, the government was fully aware of the conduct alleged in the indictment when it occurred, but chose to do nothing about it.  In a 2012 e-mail exchange between law enforcement agents, a United States Postal Inspection Service ("USPIS") Inspector acknowledged to FDA Special Agent Samanta Kelley, "We had looked at this activity back in 2008-early 2009 as they were structuring all their purchases, but then it abruptly stopped .  I spoke to the Inspector that had worked on it back in 2008-2009 . . . ."  (Ex. A, E-mail Exchange between Samanta Kelley and Victoria Martin ("Kelley-Martin E-mail").)  Apparently, the investigation the USPIS abandoned in 2009 was resurrected in 2012 when the FDA

3

A/76226439.2

1   inquired in connection with its investigation of Ms. Omidi and her sons.  (Id.)

2       Six months after that inquiry, in November 2012, the USPIS submitted a

3   report to the United States Attorney's Office suggesting that Ms. Omidi be charged

4   with structuring and money laundering, for the very same activity that the USPIS

5   had looked into in 2008 and 2009 and apparently found not of interest or not

6   chargeable.  (Ex. B, Letter from Victoria Martin to AUSA David Kirman, dated

7   Nov. 5, 2012 ("Martin Report").)  The government then delayed nearly a year

8   before filing the Indictment on October 11, 2013.

9
10
11

**C.    In an Effort to Beat the Statute of Limitations, the Government Hastily Indicts Ms. Omidi, Then Seals the Indictment For Pretextual Reasons While it Scrambles to Gather Evidence to Support the Stale Charge**

12      The indictment was not made public when it was filed; it was placed under

13  seal.  The government insisted that the indictment needed to be sealed because Ms.

14  Omidi was separately under investigation for additional alleged conduct, and the

15  indictment in this case could cause Ms. Omidi "or others to alter or destroy

16  documents, divest assets, influence witnesses, flee the jurisdiction, or otherwise

17  impair the integrity of the investigation."  (Ex. C, Dkt. No. 2, Ex Parte Application

18  to Seal Indictment, Attach. AUSA David Kirman Decl. ("Sealing App."), at 2-3.)

19  In its sealing application, the government indicated that it intended to conduct

20  searches regarding the additional conduct under investigation in November or

21  December of 2013, and said that it planned to time its arrest of Ms. Omidi on the

22  Indictment to coincide with the timing of those searches. (Ex. C, Sealing App., at

23  3.)

24      As public records and documents produced by the government reveal, the

25  government's purported reason for sealing the indictment was a mere pretext.  The

26  government's efforts to target Ms. Omidi and her family in the broader

27  investigation were no secret, but had been made public by the government itself

28

A/76226439.2

1    more than a year prior to the filing of this indictment under seal.  In June 2012, the

2    government publicly and improperly disclosed that the Omidis were targets of a

3    wide-ranging investigation in an affidavit sworn by Food and Drug Administration

4    agent Samanta Kelley:

5              I am one of the agents assigned to investigate 1-800-
               GET-THIN, Top Surgeons, Inc.,  Michael Omidi, Julian
6              Omidi, Beverly Hills Surgery Center/ and numerous
               related individuals and entities (collectively/ "1-800-
7              GET-THIS) that conduct an enterprise that promotes and
               conducts Lap-Band surgery. . . . Along with agents from
8              multiple other federal and state agencies, I am conducting
               an investigation of 1-800-GET THIN for potential
9              violations of federal law including conspiracy, health
               care fraud, wire fraud, mail fraud, tax violations, identity
10             theft, money laundering, and the Food and Drug
               Cosmetic Act.
11

12   (Ex. D, Affidavit of Samanta Kelley in Support of Complaint Against Tiffiny

13   Burrows, dated June 8, 2012, at 2-3.)  The investigation had also been intensively

14   covered by the Los Angeles Times and other news outlets.  (See, e.g.,

15   http://articles.latimes.com/2012/oct/23/business/la-fi-get-thin-feds-20121023;

16   http://www.latimes.com/business/la-fi-get-thin-accreditation-20130822-story.html;

17   http://articles.latimes.com/2013/may/10/business/la-fi-get-thin-omidi-20130511.).  Several

18   grand jury subpoenas had been served on the businesses under investigation,

19   including businesses the government believes to be associated with Ms. Omidi, and

20   substantial amounts of documents had been produced in response to those

21   subpoenas.  Thus, there was nothing that the structuring indictment could possibly

22   disclose about the ongoing investigation because that investigation was already

23   public and known to Ms. Omidi.  Indeed, the notion that an indictment on a

24   structuring charge would cause the 65-year-old Ms. Omidi (a cancer survivor and

25   30-year resident of Los Angeles) or her sons to flee, destroy documents, or do

26   other things that they had not done after years of intensive and public federal

27   investigation is so patently unfounded that it suggests other reasons were behind

28   the sealing.

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

1   The government has recently produced e-mails that further demonstrate that
2   the government's sealing application was a pretext designed to conceal the fact that
3   the government was unprepared to proceed with the structuring indictment but
4   wanted to indict quickly in an attempt to avoid mounting statute-of-limitations
5   problems.  In October 2013, several of the transactions alleged in the indictment
6   were falling beyond the statute of limitations; indeed, five of the 23 transaction
7   dates at issue in the indictment were already more than five years old, and eight
8   more October 2008 dates would soon lapse beyond the five-year threshold.  It was
9   therefore incumbent on the government to indict quickly.  The day before the
10  indictment was presented and returned, the government issued an "urgent, one time
11  data request" seeking information concerning the very issue at the heart of the
12  postal money transactions charged in the indictment – specifically, records
13  concerning "what type of tender(s) was used to pay for these money order
14  purchases."  (Ex. E, E-mail exchange involving Eugene Seffert ("Seffert E-mail"),
15  dated Oct. 10-16, 2013.)  This means that on the day before the government filed
16  an indictment charging Ms. Omidi with structuring cash purchases of money
17  orders, the government was scrambling to obtain essential evidence that cash was
18  actually used to buy those money orders.  See 31 C.F.R. § 103.29 (requiring
19  financial institutions to maintain records of money orders purchased with "$3,000
20  or more **in currency**" (emphasis added)); Indictment ¶ 3 ("The [Bank Secrecy Act]
21  required the USPS and other financial institutions to obtain information about any
22  customer who purchased $3,000 or more in money orders **using cash**." (emphasis
23  added)).
24  The flurry of e-mails on the eve of indictment made it clear to the
25  government that it could not get the requested information in time.  (Ex. E, Seffert
26  E-mail ("The money orders you have requested are from August 2010 and earlier.
27  This data is now archived.  It can be retrieved from Archives but there would be a
28  cost associated with it and with providing the data. . . .  I cannot say how long it

6

A/76226439.2

1   would take as we need Eagan to provide the data.").)  Nevertheless, the

2   government went forward with the presentation and filing of the indictment the

3   next day, on October 11, 2013.  Nearly a week later, on October 16, 2013, the

4   government was still pressing its "urgent" request for additional information

5   regarding the form of tender used for the transactions alleged in the indictment –

6   critical information going to an essential element of the already-returned

7   indictment against Ms. Omidi.

8        The government's delays in obtaining this additional information coincided

9   with delays in the events that would unseal the indictment.  Searches originally

10  slated for November or December 2013 (according to the government's initial

11  sealing application) were delayed until June 2014 in an apparent attempt to allow

12  the government to obtain the information regarding the postal money order

13  transactions at issue in the indictment that it had frantically sought on the day

14  before the indictment was returned.  By keeping the indictment under seal and

15  delaying its arrest of Ms. Omidi, the government was able to obtain critical

16  evidence that it did not have when it indicted Ms. Omidi in October 2013, and

17  would not have had in time for a speedy trial in December 2013 or January 2014.

18  ### D.    The Government's Arrest of Ms. Omidi and Searches of Her

19                Home and Related Businesses

20       In the early morning hours of June 4, 2014, nearly eight months after the

21  government had indicted Ms. Omidi on this stale, largely time-barred, and

22  relatively insignificant structuring case, agents stormed Ms. Omidi's home, rousted

23  her from her bed, and arrested her at gunpoint while other agents executed search

24  warrants at her home and at locations affiliated with businesses in which she and

25  her sons were involved.  (Ex. F, Search Warrant for 1235 Sierra Alta Way, West

26  Hollywood, Ca., No. 04-1033M; Ex. G, Search Warrant for 9001 Wilshire Blvd.,

27  Beverly Hills, Ca., No. 04-1035M; Ex. H, Search Warrant for One Wilshire Blvd.,

28  Los Angeles, Ca., No. 04-1030M.)  During those searches, the government seized

7

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

**100 terabytes** of electronic data and **1,700 boxes** of hard copy documents. (Ex. I, Letter from Assistant United States Attorney Evan Davis, dated June 19, 2014 ("Davis Letter"), at 1, 2.)

The government took Ms. Omidi in handcuffs and hauled her to the Roybal Federal Building, where they sought detention of a 65-year old United States citizen and cancer survivor who has resided in the Los Angeles area for 30 years. (Notice of Request for Detention, Dkt. No. 7.) The government's request for detention was denied, and Ms. Omidi was released on bond. (Minutes of Detention Hearing, Dkt. No. 29.)

### E.    The Overlap Between the Indictment and the Search Warrant For Ms. Omidi's Residence

In an attempt to narrow its discovery obligations in this case, the government has maintained that the search warrant executed at Ms. Omidi's arrest concurrently with her arrest on June 4, and all evidence seized pursuant to that and other warrants executed on the same date, pertain to a separate investigation of unrelated criminal activity. The government's attempted distinction between the indicted case and the search warrant investigation, however, collapses upon closer scrutiny:

- Same Targets: Ms. Omidi and her sons have been named as targets of the investigation of both the crimes alleged in the indictment and the crimes at issue in the search warrant. (Ex. B, Martin Report, at 1; Ex. F, Sierra Alta Search Warrant, at 1-6.)

- Same Crimes: Both the search warrant and the indictment involve the same alleged criminal activity: money laundering. The search warrant specifically names money laundering under 18 U.S.C. § 1956 as a target crime, while the investigative report regarding the indictment in this case identifies money laundering as a crime to be considered for indictment. (Ex. B, Martin Report, at 5; Ex. F, Sierra Alta Search

8

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

Warrant, at 3).  The search warrant thus sought documents related to the very crime for which Ms. Omidi was investigated in the probe leading to the indictment.  Moreover, the search warrant identified other financial crimes such as tax evasion that would logically involve records relevant to the structuring charges in the indictment.

- Same Company: The search warrant executed at Ms. Omidi's home expressly sought documents regarding "Pacific West Dermatology"—the very company whose bank account is the focus of the indictment and into which the allegedly structured money orders were deposited. (Ex. B, Martin Report, at 3; Ex. F, Sierra Alta Search Warrant, Attach. Entity List, at 5.)

- Same Date and Time: The government arrested Ms. Omidi on the charges in the indictment on the same day that the government executed search warrants at her home and several business locations that the government believes to be associated with her and her family. Ms. Omidi's arrest took place at gunpoint while the government executed the search warrant at her home.

- Same Agents and Agencies:  The lead case agent on the search warrant investigation – Samanta Kelley of the Food and Drug Administration ("FDA")—was heavily involved in investigating the crimes alleged in the indictment.  (Ex. D, Complaint re: Tiffiny Burrows, dated June 8, 2012; Ex. A, Kelley-Martin E-mail.)

- Same Prosecutors:  The prosecutors assigned to the indicted case against Ms. Omidi are the same prosecutors who authorized the search warrants executed at Ms. Omidi's home and elsewhere.

- Same Investigation:  As noted above, communications disclosed by the government demonstrate that the structuring indictment was the

9

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

direct result of the investigation that led to the search warrants, and further that the stale and long-abandoned structuring charges appear to have been resurrected for the purpose of gaining leverage against Ms. Omidi and her sons in the search warrant investigation. (Ex. A, Kelley-Martin E-mail, at 2.)

The government itself linked the investigation that led to the search warrants with the investigation that led to the indictment when it sought to seal the indictment based on the claim that not doing so would compromise the search warrant investigation. (Ex. C, Sealing App., at 2-3.) That assertion indicates that even the government views the indictment as directly related to the search warrant investigation; if they were truly unrelated as the government now contends, there would have been no basis for the government to be concerned that the unsealing of the structuring indictment would alert Ms. Omidi and others to the existence of the search warrant investigation or result in the destruction of documents relevant to that investigation. More recently, the government has thus far declined to stipulate that it will not seek to use evidence seized in or derived from the searches in its prosecution of this case.

These facts expose as illusory the bright-line distinction that the government seeks to draw between the investigation that led to the search warrant for Ms. Omidi's home and the investigation that led to the indictment in this case. The facts and circumstances demonstrate that the two investigations were inextricably intertwined as part of the government's broader effort to target Ms. Omidi and her sons. Thus, the government's attempt to cordon off discovery regarding that broader effort, as further discussed below, must fail.

10

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   ARGUMENT

### A.   Rule 16 and Brady Require the Disclosure of the Search Warrant Affidavit

Rule 16 of the Federal Rules of Criminal Procedure requires the disclosure of any documents that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  Courts have described "material" information under Rule 16 as information that is "significantly helpful to an understanding of important inculpatory or exculpatory evidence.  The materiality requirement typically is not a heavy burden; rather, evidence is material as long as there is a strong indication that the evidence will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.  United States v. Liquid Sugars, Inc., 158 F.R.D. 466, 471 (E.D. Cal. 1994) (internal quotations, citation, and emphasis omitted); see United States v. Poindexter, 727 F. Supp. 1470, 1473 (D.D.C. 1989) ("The language and the spirit of [Rule 16] are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive [discoverable] materials . . . .")

Similarly, Brady v. Maryland, 373 U.S. 83 (1963), requires the disclosure of "information that is likely to result in admissible evidence that would give the jury [or] a court a more complete basis for judging guilt or punishment."  United States v. Sudikoff, 36 F. Supp. 2d 1196, 1201 (C.D. Cal. 1999), quoted with approval in United States v. Price, 566 F.3d 900, 913 n.14 (9th Cir. 2009) ("For the benefit of trial prosecutors who must regularly decide what material to turn over, we note favorably the thoughtful analysis set forth [in Sudikoff].").

The government has refused to disclose the affidavit in support of the search warrant executed at Ms. Omidi's home.   That affidavit, however, is material to preparation of the defense in this case by virtue of the substantial interrelatedness

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

and overlapping nature of the investigations and the charges. In order to justify the search of Ms. Omidi's home for the specified items, the affidavit must necessarily have demonstrated probable cause that (i) the crimes enumerated in the search warrant were committed; (ii) Ms. Omidi committed them; and (iii) evidence of those crimes would be found at Ms. Omidi's home. See Chism v. Washington, 661 F.3d 380, 389 (9th Cir. 2011). The search warrant seeks a litany of documents "relating to . . . Cindy Omidi" and further identifies several alleged financial crimes as the focus of the search, including money laundering, which is directly connected to the crime charged in the Indictment.[1] (Ex. F, Sierra Alta Search Warrant.) Thus, the affidavit must necessarily have contained evidence that money-laundering-related crimes like the one charged in the indictment were committed and that Ms. Omidi committed them. That information would undoubtedly be "significantly helpful to an understanding of important inculpatory or exculpatory evidence" regarding the crime alleged in the indictment. Liquid Sugars, 158 F.R.D. at 471.

But the search warrant was even more closely tied to this case; the items to be seized listed "items relating to . . . Pacific West Dermatology," including all documents, correspondence, financial records (and specifically "[b]ank statements and records, . . . money orders and other money transfer records, . . . and deposit records") , and ownership and control records. (Ex. F, Sierra Alta Search Warrant, at 2 & Attach. Entity List, at 5.) Pacific West Dermatology is the very entity whose bank account lies at the heart of the indictment. (Ex. B, Martin Report, at 3 ("The bulk of the money orders (180) were deposited into the above referenced

_____

[1] Currency structuring is a subspecies of money laundering and was proscribed as a felony by the Money Laundering Control Act of 1986, codified at 18 U.S.C. §§ 1956 & 1957. Congress's purpose in making structuring a crime was to "provide Federal law enforcement agencies with additional tools to investigate money laundering [and to] curb the spread of money laundering, by which criminals have successfully disguised the nature and source of funds from their illegal enterprises." S. Rep. No. 99–433, pp. 1–2 (1986).

12

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

East West bank account of Pacific West Dermatology . . . .".).)  The affidavit in support of the search warrant must necessarily have contained probable cause concerning financial transactions involving Ms. Omidi and Pacific West Dermatology – information inextricably intertwined with the charged offense in the indictment that clearly "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  Liquid Sugars, 158 F.R.D. at 471 (internal quotation marks and emphasis omitted).[2]

Because the affidavit must have set forth probable cause that Ms. Omidi was involved in the enumerated crimes and had the specified items at her house, it must necessarily contain information currently in the government's possession concerning Ms. Omidi, Pacific West Dermatology and other related entities, the relationships between Ms. Omidi and those entities, and financial transactions involving Ms. Omidi and those entities.  It is those very kinds of transactions that are the subject of the indictment.  The government cannot legitimately claim that a detailed report of evidence in its possession concerning the same defendant, the same company, related transactions, similar defenses, arising out of the same investigation as the indictment in this case, and supporting a search of the defendant's home at the same time as her arrest on the current charges does not meet even the minimal Rule 16 threshold for materiality.

Finally, the government has declined at this point to commit to not using any evidence from the June 4 searches at Ms. Omidi's upcoming trial, nor has it

---

[2] Moreover, the list of items to be seized demonstrates that the government believes Ms. Omidi is involved with companies other than Pacific West Dermatology, and the search warrant authorized the government to seek financial records regarding all of those companies.  (Ex. G, Sierra Alta Search Warrant, at 2 & Attach. Entity List, at 1-7.)  In a case that is focused directly on Ms. Omidi's state of mind regarding financial transactions and her purported evasion of recordkeeping of those transactions, the search warrant affidavit's information concerning Ms. Omidi's relationship with those other companies and their financial transactions would be "likely to result in admissible evidence that would give the jury [or] a court a more complete basis for judging guilt or punishment."  Sudikoff, 36 F. Supp. 2d at 1201.

13

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

committed to not obtaining or using any evidence derived from the seized

evidence.  (Ex. I, Davis Letter, at 2.)  In light of the government's position,

production of the search warrant should be compelled to allow Ms. Omidi an

opportunity to seek to suppress such direct and derivative evidence.[3]

### B.    Grand Jury Transcripts Should Be Produced Based on a Showing of Potential Grand Jury Abuse

#### 1.    A Court May Compel the Disclosure of Grand Jury Materials Upon the Showing of Particularized Need by a Defendant

A federal grand jury serves to independently decide which cases should be

prosecuted and in the process acts as a buffer to protect citizens against unfair

charges.  See United States v. Navarro-Vargas, 408 F.3d 1184, 1196 (9th Cir.

2005) (en banc) ("[T]he Supreme Court has steadfastly insisted that the grand jury

remains as a shield against unfounded prosecutions.")  The Fifth Amendment

states that "[n]o person shall be held to answer for a capital, or otherwise infamous

crime, unless on a presentment or indictment of a grand jury."  U.S. Const. amend.

V.  The purpose of the grand jury requirement "is to limit a person's jeopardy to

offenses charged by a group of his fellow citizens acting independently of either

the prosecutor or the judge."  United States v. Basurto, 497 F.2d 781, 785 (9th Cir.

1974) (citing Stirone v. United States, 361 U.S. 212 (1960)).  Moreover, the

Supreme Court has made clear that indictment must be by an unbiased and

independent grand jury.  United States v. Williams, 504 U.S. 36, 49 (1992);

Costello v. United States, 350 U.S. 359, 363 (1956).  This guarantee is not a

platitude – it is a critical constitutional protection that deserves the utmost respect

---

[3] Given the close overlap between this case and the search warrant investigation, as well as the circumstances of the government's hasty indictment and the fact that the warrants sought evidence of money orders relating to Pacific West Dermatology and other evidence that is directly relevant here, there is reason to be concerned that the government used the searches at least in part to gather additional evidence in support of this weak, previously indicted case.  Even were the government to now commit to not using such evidence at trial, however, production of the affidavit should still be compelled for the other reasons detailed above.

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

from the prosecution.  See United States v. Serubo, 604 F.2d. 807, 816 (3d Cir. 1979).  However, "[t]he fact that grand jury proceedings are secret, Ex parte and largely under the control of the federal prosecutor magnifies this concern" that the guarantee of independence and a lack of bias will not be given the deference it requires.  Id. (footnote omitted).

To be sure, the "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts" is also an important facet of our criminal justice system.  United States v. Procter & Gamble Co., 356 U.S. 677, 681 (1958).  This policy is based on several concerns related to the grand jury process, including the concern that if grand jury proceedings were made public, there is the potential that prospective witnesses would be hesitant to come forward voluntarily or to testify fully and frankly for fear of potential repercussions from those against whom they testify.  See, e.g., Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 219 (1978).  In this regard, encouraging the "free and untrammeled disclosures by persons who have information with respect to the commission of crimes" also has been recognized as a reason for secrecy.  Procter & Gamble Co., 356 U.S. at 681 n.6 (internal citation omitted).  Pre-indictment flight risk, as well as the worry that those ultimately exonerated by a grand jury would be subject to public ridicule if their identities were made public, also mitigates in favor of secrecy.  See Douglas Oil, 441 U.S. at 219.

Grand jury secrecy, however, is not absolute.  Indeed, the Supreme Court has made clear that the standard for protecting the secrecy of grand jury proceedings is a flexible one and that the need for maintaining secrecy is greater in some cases than in others.  See United States v. John Doe, Inc. I, 481 U.S. 102, 112-13 (1987).  Moreover, the Court has opined that the interests in maintaining grand jury secrecy are reduced when the grand jury has ended its activities.  See Douglas Oil, 441 U.S. at 222; see also Dennis v. United States, 384 U.S. 855, 870 (1966) (recognizing that "after the grand jury's functions are ended, disclosure is

15

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

1   wholly proper where the ends of justice require it") (internal quotations and

2   citation omitted); <u>see also</u> <u>United States v. Mahoney</u>, 495 F. Supp. 1270, 1273

3   (E.D. Pa. 1980).  This makes sense given that the majority of the factors

4   underlying grand jury secrecy (as detailed above) disappear once the grand jury

5   has finished its work.  <u>See</u> <u>Douglas Oil</u>, 441 U.S. at 222 (recognizing that "the

6   interests in grand jury secrecy, although reduced, are not eliminated merely

7   because the grand jury has ended its activities"); <u>see also</u> <u>United States v. Twersky</u>,

8   No. S2 92 Cr. 1082 (SWK), 1994 U.S. Dist. LEXIS 8744, at *15 (S.D.N.Y. June

9   29, 1994) (noting that "[g]enerally, however, once an investigation is over, most of

10   the policies which warrant maintaining the secrecy of the grand jury proceeding …

11   are no longer present"); <u>Mahoney</u>, 495 F. Supp. at 1273 (same).

12           Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) ("Rule 6(e)") codifies the

13   standard under which a court may order disclosure of matters occurring before a

14   grand jury, making clear that this may occur "at the request of a defendant who

15   shows that a ground may exist to dismiss the indictment because of a matter that

16   occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  This may arise,

17   for example, in the context of prosecutorial misconduct, where a defendant

18   demonstrates that the indictment should be dismissed as a result of misconduct that

19   occurred before the grand jury or elsewhere.  <u>See</u> <u>United States v. Carona</u>, No.

20   SACR 06-0224 AG, 2008 WL 1970205, at *2 (C.D. Cal. May 2, 2008) (stating

21   that "particularized need can arise in the context of unfair or improper

22   prosecutorial conduct") (internal quotations and citation omitted).  Often, in order

23   to fully evaluate the full extent of the prosecution's malfeasance in the wake of

24   such a motion, courts will review and refer to grand jury proceedings.  <u>See, e.g.</u>,

25   <u>United States v. Samango</u>, 607 F.2d 877, 878-79 (9th Cir. 1979).

26           The standards a district court should follow in deciding whether to release

27   grand jury transcripts are "(1) that the desired material will avoid a possible

28   injustice, (2) that the need for disclosure is greater than the need for continued

16

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

1    secrecy, and, (3) that only the relevant parts of the transcripts should be disclosed."

2    United States v. Plummer, 941 F.2d 799, 806 (9th Cir. 1991) (citing Douglas Oil

3    Co., 441 U.S. at 223.  Compelling such disclosure is wholly within the discretion

4    of a district court.  See Douglas Oil, 441 U.S. at 223 (court has "substantial

5    discretion" to decide whether grand jury transcripts should be released); see also

6    Plummer, 941 F. 2d at 806 (decision to release grand jury transcripts is reviewed

7    for abuse of discretion).  The Ninth Circuit has recognized the Supreme Court's

8    "general suggestion in favor of disclosure" of grand jury materials.  United States

9    v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (citing Dennis, 384 U.S. at 870).

10   Thus, when a defendant articulates specific facts and evidence that that support

11   disclosure, and the policies underlying the need for grand jury secrecy are minimal,

12   court-compelled disclosure is warranted.  See, e.g., Carona, 2008 WL 1970205, at

13   *5 (reviewing requested grand jury transcripts in camera and permitting disclosure

14   of material relevant to defendants' arguments where articulated need outweighed

15   policy reasons for grand jury secrecy);  United States v. Naegele, 474 F. Supp. 2d

16   9, 11-12 (D.D.C. 2007) (compelling disclosure of production and inspection of

17   grand jury materials prior to evidentiary hearing to determine whether any

18   prosecutorial misconduct took place); accord Douglas Oil, 441 U.S. at 222;

19   Dennis, 384 U.S. at 871-72; Plummer, 941 F.2d at 806.

20           2.     Ms. Omidi Has a Particularized Need for Disclosure of Specific
21                  Grand Jury Materials

22           Ms. Omidi requests that the Court compel disclosure of the following

23   discreet and specific materials related to the grand jury proceedings here:  (1) the

24   transcripts of all statements made by the prosecution to the grand jury during the

25   course of the investigation and indictment of the structuring case, including,

26   without limitation, (a) the prosecution's introductory remarks at the beginning of

27   the investigation and before or after any witness' testimony, (b) the entire

28

17

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

1    transcript of the day or days on which the grand jury was read the indictment

2    (including the prosecution's introductory remarks and closing statements), and (c)

3    any instructions given to the grand jury concerning the elements of the charged

4    offense; and (2) the transcripts of any grand jury testimony by any witness

5    regarding the purchase of any of the money orders listed in the indictment.

6          As discussed above, the facts and circumstances surrounding the return of

7    the indictment in this case suggest that the government engaged in a pretextual

8    effort to keep the indictment under seal while the government labored to fill a

9    critical gap in the evidentiary record as to an essential element.  Those facts and

10   circumstances include the following:

11         •      In order to prevail in this case and be prepared for trial, the

12   government needed evidence that Ms. Omidi structured purchases of postal money

13   orders using cash.

14         •      The day before the government presented the indictment to the grand

15   jury, the government made an urgent request seeking the evidence it needed to

16   prove an essential element of its case – specifically, that cash was used to purchase

17   the postal money orders at issue in the indictment.

18         •      In response to its request, the government was informed that the

19   evidence would not be available for quite some time.

20         •      The government nevertheless presented the Indictment on October 11,

21   2013.  At that time, seven of the charged transactions were due to lapse out of

22   statute within the next three weeks.

23         •      In the days after the indictment was returned, the government

24   continued to seek evidence that cash was used to purchase the money orders at

25   issue in the indictment.  It is unclear when that evidence became available, but it

26   appears that the government unsealed the indictment only after the evidence

27   became available.

28         •      In view of the public nature of the ongoing healthcare fraud

18

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

1  investigation, the government offered misleading reasons for the initial sealing and

2  continued sealing of the indictment, and did not disclose the unavailability of the

3  evidence as a reason for obtaining or maintaining the seal.

4        The above particularized facts establish a need for disclosure that exceeds

5  any need for continued secrecy of the grand jury investigation that resulted in the

6  indictment in this case.  <u>See</u> <u>Plummer</u>, 941 F.2d at 806.  There is certainly reason

7  for concern that the government did not have on October 11, 2013 – and therefore

8  could not have presented to the grand jury – evidence that the money orders

9  charged in the indictment were purchased with cash, an essential element of the

10  structuring charge in the indictment.  If the government did not present such

11  evidence to the grand jury – or worse, presented misleading or unsupported

12  evidence – then Ms. Omidi could seek to have the indictment dismissed for grand

13  jury abuse.  <u>See, e.g.</u>, <u>United States v. Cerullo</u>, 2007 WL 2683799 (S.D.Cal. Sept.

14  7, 2007); <u>United States v. Di Bernardo</u>, 552 F. Supp. 1315, 1325 (S.D. Fla. 1982),

15  <u>rev'd on other grounds</u>, 880 F.2d 1216 (11th Cir. 1989).  Ms. Omidi's specific

16  requests for testimony on this subject and for the prosecutor's statements to the

17  grand jury are adequately tailored to address the particularized need shown above,

18  and disclosure should be ordered.

19            3.     <u>*In Camera* Review of the Requested Materials</u>

20        If the Court is reluctant to order that the grand jury materials sought herein

21  be disclosed, Ms. Omidi requests that the Court review these materials *in camera*

22  to determine whether she should be permitted to inspect them.  Indeed, when

23  considering whether or not disclosure of grand jury materials is appropriate, courts

24  routinely inspect the materials *in camera* to determine if relevant material is

25  contained therein.  <u>See, e.g.</u>, <u>Plummer</u>, 941 F.2d at 806; <u>Carona</u>, 2008 WL

26  1970205, at *5; <u>Naegele</u>, 474 F. Supp. 2d at 12; <u>Twersky</u>, 1994 U.S. Dist. LEXIS

27  8744, at **15, 16; <u>Di Bernardo</u>, 552 F. Supp. at 1325.  Following this review,

28

A/76226439.2

1    courts will disclose specific materials to the requesting defendant where

2    appropriate.  See, e.g., Plummer, 941 F.2d at 806 (noting that the district court had

3    "conducted an in camera review of the grand jury transcripts and decided to

4    provide Mr. Plummer with all of the relevant parts"); see also Carona, 2008 WL

5    1970205, at *5 (same); Naegele, 474 F. Supp. 2d at 12 (disclosing full grand jury

6    record after in camera review).

### C.    The Government Should Be Compelled to Comply With its Obligations Under Brady By Reviewing All Evidence in its Possession For Exculpatory Information in Advance of Trial

10        The government has seized, through its searches of Ms. Omidi's home and

11    of businesses with which the government contends she is associated, an

12    astonishing 100 terabytes of electronic data and 1,700 boxes of paper documents.

13    Based on the list of items to be seized in the search warrants, it is inevitable that

14    some or much of the seized evidence overlaps with the charges and potential

15    defenses in this case.  Yet the government has made clear that it has no intention of

16    reviewing the evidence in its possession for exculpatory material before Ms.

17    Omidi's July 29 trial date; instead, the government proposes to dump an avalanche

18    of documents and data on the defense and demand that the defense perform the

19    government's Brady review.  As dictated by Supreme Court and other case law, the

20    government cannot evade its constitutional duties in this manner.

#### 1.    The Government's Brady Obligations

22        Under the Due Process Clause of the Fifth Amendment, the government has

23    an obligation to disclose evidence favorable to the defendant that is material to

24    either guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963);

25    see United States v. Bagley, 473 U.S. 667, 676 (1985); United States v. Agurs, 427

26    U.S. 97, 110-11 (1976).  The government must produce "any potentially

27    exculpatory or otherwise favorable evidence without regard to how the

28

A/76226439.2

withholding of such evidence might be viewed with the benefit of hindsight" after the trial. United States v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005). "The only question before (and even during) trial is whether the evidence at issue may be 'favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." Id. (citing cases); see also United States v. Sudikoff, 36 F. Supp. 2d 1196, 1199-1200 (C.D. Cal. 1999) (in pre-trial context, government is "obligated to disclose all evidence . . . which might reasonably be considered favorable to the defendant's case," including "inadmissible evidence that would [lead] to admissible evidence"); United States v. Carter, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) ("in the pre-trial context, the court should require disclosure of favorable evidence under Brady and Giglio without attempting to analyze its 'materiality' at trial").[4]

According to well established case law, it is the *prosecution* – not the defense – that has the affirmative duty to review the records in its possession to identify Brady material. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . ."); Carriger v. Stewart, 132 F.3d 463, 479-80 (9th Cir. 1997) ("The prosecution is obligated by the requirements of due process to disclose material exculpatory evidence on its

---

[4] The defense has also requested production of Giglio material from the government. See Giglio v. United States, 405 U.S. 150 (1972). Because the defense does not know the identity of the government's witnesses, it cannot assess whether any impeachment information is likely to be contained in the documents and records that are in the government's possession. To the extent such information exists, however, the government's obligation is the same as for Brady material, and this motion seeks to compel such review and production as well. See United States v. Bagley, 473 U.S. 667, 676 (1985) ("Impeachment evidence, [] as well as exculpatory evidence, falls within the Brady rule.").

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

own motion, without request. . . .  [T]he prosecution [also] has a duty to learn of any exculpatory evidence known to others acting on the government's behalf."); see also United States v. Banks, 374 F. Supp. 321, 330 (D.S.D. 1974) ("It is the prosecutors themselves who must personally direct a search of the files in pursuit of discoverable material.").  Nor may the prosecutors delegate their constitutional duties to case agents.  See, e.g., United States v. Alvarez, 86 F.3d 901, 905 (9th Cir. 1996) ("[W]e see little justification and much danger to both the prosecutor's reputation and the quality of justice her office serves for a prosecutor not to review personally those materials directly related to the investigation and prosecution of the defendants . . . .").[5]

Finally, due process requires that Brady evidence be disclosed to the defense in sufficient time to be used effectively at trial.  LaMere v. Risley, 827 F.2d 622, 625 (9th Cir. 1987); see United States v. Fernandez, 231 F.3d 1240, 1248 (9th Cir. 2000).

>    2.    The Government Should Not Be Permitted to Evade its Constitutional *Brady* Obligations By Dumping Voluminous Documents on the Defense

The documents and records seized during the searches on June 4, 2014 are unquestionably within the government's possession, custody, and control. Moreover, if Brady information is contained in any of those documents and records, the government is obligated to produce such information in advance of

---

[5] Apart from case law, the Department of Justice's own guidelines, "fashioned after some embarrassing non-disclosures in other cases, command an *actual review* of the materials acquired during investigation of a criminal case for the purpose of disclosing *Brady/Giglio* materials."  United States v. Salyer, 2010 WL 3036444 at  *3 (E.D. Cal. Aug. 2, 2010) (emphasis in original); see United States Attorney's Manual, Title 9, Section 165 ("Guidance for Prosecutors Regarding Criminal Discovery") (Jan. 4, 2010) (stating *inter alia* that "[i]t is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team," that "generally all potentially discoverable material within the custody or control of the prosecution team should be reviewed," that "[g]enerally, all evidence and information gathered during the investigation should be reviewed, including anything obtained during searches or via subpoenas, etc.," and that "prosecutors must ensure that the material is reviewed to identify discoverable information").

A/76226439.2

1   trial in this case.  Yet in communications with the defense, the government has

2   taken the position that (1) there is no <u>Brady</u> material with respect to the current

3   indictment in the massive amount of data that was seized on June 4, and (2) its

4   <u>Brady</u> obligations are satisfied by producing or making available all seized, non-

5   privileged evidence to the defense (which it is not clear at this point the

6   government will be able to do in advance of trial).

7       With respect to the first point, apart from the fact that the government cannot

8   possibly know what the seized documents contain until it has reviewed them (a

9   process that apparently has not yet even begun), the government's speculation

10  about what is and is not contained in those documents is almost certainly wrong.

11  As discussed above, the mountain of documents and electronic data seized during

12  execution of the government's search warrants – data seized at the time of Ms.

13  Omidi's arrest on the charges in this case – includes evidence from Ms. Omidi's

14  home and businesses, evidence relating to Ms. Omidi's finances and to those of the

15  company whose bank account is the focus of the current indictment, evidence

16  relating to that bank account itself, and evidence relating to financial crime charges

17  that are both legally and factually intertwined with those in this case and were

18  investigated by the same agents, agencies and prosecutors against the same targets.

19  It is inconceivable, applying the liberal standards governing <u>Brady</u> evidence, that

20  **nothing** in the vast amount of evidence now in the government's possession

21  pursuant to searches could reasonably be considered favorable to the defense in a

22  trial on charges against the same target named in the search warrants for financial

23  transactions involving the same business named in those warrants.  Certainly, such

24  an unlikely conclusion cannot be reached without a careful and thorough review of

25  the evidence itself – an obligation that falls squarely, and exclusively, on the

26  government.  <u>See</u> <u>Kyles</u>, 514 U.S. at 437 (prosecution has the duty to learn of

27  favorable evidence and to make proper disclosure).

28      Indeed, during a meet-and-confer held on June 27, 2014, the government

23

---

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

1   expressly **declined** the defense's invitation to represent that there is no <u>Brady</u> or

2   <u>Giglio</u> material contained anywhere in the seized evidence.  (Declaration of

3   Matthew Donald Umhofer, ¶¶ 2-3).  Absent the ability to make such a

4   representation, the government has the clear duty to review the evidence in its

5   possession for exculpatory information.  Yet the government has represented to the

6   defense only that it will instruct its agents to search for <u>Brady</u> and <u>Giglio</u>

7   information during the course of their upcoming "months-long review" and that it

8   will turn over any such information "as soon as practicable."  (Ex. I, Davis Letter,

9   at 2.)  Ms. Omidi's trial is scheduled to commence on July 29.

10      As for the government's "document dump" approach, courts have recently

11   addressed the government's <u>Brady</u> obligations in light of the rise of e-discovery

12   and the attendant increase in voluminous document cases.  Relying on <u>Kyles</u> and

13   other Supreme Court case law, those courts have held that the government does not

14   satisfy its constitutional duty by dumping documents on defense counsel and

15   telling them to review the documents for <u>Brady</u> material.  For example, one court

16   observed that "open-file discovery does not relieve the government of its <u>Brady</u>

17   obligations.  The government cannot meet its <u>Brady</u> obligations by providing [the

18   defendant] with access to 600,000 documents and then claiming that she should

19   have been able to find the exculpatory information in the haystack."  <u>United States</u>

20   <u>v. Hsia</u>, 24 F. Supp. 2d 14, 29 (D.D.C. 1998), <u>rev'd in part on other grounds</u>, 176

21   F.3d 517 (D.C. Cir. 1999).  The court went on to emphasize that, in accordance

22   with Supreme Court precedents, "it is the *government's* responsibility in the first

23   instance to determine whether information in its possession is *Brady* material."  <u>Id.</u>

24   at 30 (emphasis added).

25      Similarly, in <u>United States v. Salyer</u>, 2010 WL 3036444 (E.D. Cal. Aug. 2,

26   2010), the court relied on established case law and the Department of Justice's own

27   discovery guidance in concluding that the "the *prosecution* has the duty to

28   *affirmatively* scout those records of the agencies considered the 'government' for

A/76226439.2

purposes of the criminal case in order to determine and acquire those materials which would be considered *Brady* exculpatory and *Giglio* impeaching." Id. at *3. The court noted that "nowhere in the [DOJ guidance] does it even suggest that in lieu of affirmatively looking for *Brady/Giglio* the prosecutor may determine not to look at all and simply disclose the entire discovery file. The prosecutor's argument that his duty to affirmatively search for *Brady/Giglio* information is performed by not searching is oxymoronic in nature." Id.

Although the government argued in Salyer that it was an "impossible" burden to review all the evidence gathered during its investigation for Brady material, the court found that the government's duty to do so is even more compelling in a "big documents" case. Id. at *3-5. Indeed, the court found that the government's impossibility claim was wholly inconsistent with its argument that "the defense can ferret out all of the *Brady/Giglio* material itself," and observed that the defense's burden would be even more impossible than the government's given the length of the government's pre-indictment investigation as compared to the short period between indictment and trial. Id. at *4. The court dismissed the government's argument as effectively claiming "that logistics in the 'big documents' case render *Brady/Giglio* a dead letter no matter who has the burden of ascertaining the information. There is no authority to support this evisceration of constitutional rights just because the case has voluminous documentation." Id. at *5. As the court recognized, the "ultimate issue" in these massive document cases "is whether there is 'disclosure' in the letter *and* spirit of *Brady/Giglio* simply by turning over a mountain of 'everything' . . . and telling defense counsel nothing about where exculpatory/impeaching information can be found." Id. at *6 (emphasis in original); compare United States v. Skilling, 554 F.3d 529, 577 (5th Cir. 2009) (finding no Brady violation from government's voluminous open-file discovery where the government "did much more than drop several hundred million pages on Skilling's doorstep," including producing an electronic, indexed,

A/76226439.2

1  and searchable database and highlighting particularly relevant documents).

2  The evidence in <u>Hsia</u> consisted of over 600,000 documents.  <u>Hsia</u>, 24 F.

3  Supp. 2d at 28.  The evidence in <u>Salyer</u> consisted of "multiple gigabytes" of

4  electronic information, each averaging over 677,000 text file pages and over

5  100,000 pages of e-mail files, as well as two storage containers of hard documents.

6  <u>Salyer</u>, 2010 WL 3036444 at *3 & n.3.  In this case, by contrast, the government

7  has stated that the evidence seized in its searches comprises *1,700 boxes of*

8  *documents and 100 **terabytes** of electronic data*.[6]  The utterly mind-bending

9  volume of such evidence makes the analysis of <u>Hsia</u> and <u>Salyer</u> apply more than

10  ten-thousandfold.  If the government's open-file disclosure of the 600,000

11  documents in *Hsia* constituted an unacceptable invitation "to find the exculpatory

12  information in the haystack," <u>Hsia</u>, 24 F. Supp. 2d at 29, then the government's

13  apparent position here that the *defense* should perform the *government's* obligation

14  of reviewing some **7.5 billion** electronic pages (plus 1,700 boxes) for <u>Brady/Giglio</u>

15  material is an invitation to find exculpatory information in a field of over 1,000

16  haystacks.  Moreover, because of the overwhelming amount of time necessary for

17  review – months or even years, according to the government's own estimates – the

18  government's demand effectively forces Ms. Omidi to choose between exercising

19  her right to a speedy trial or her right to a constitutionally fair one.[7]

20

21

22

23

24  [6] Each terabyte of information is 1,000 gigabytes, the unit of measurement at issue in <u>Salyer</u>.  A

25  terabyte is the equivalent of 7.5 million electronic documents, or 75 million printed pages.  *See*
    http://us.hudson.com/legal/esi-calculator.

26  [7] Even were the defense to be given the responsibility of reviewing the seized evidence for <u>Brady</u>
    material, the logistics of simply copying and producing the seized evidence make it impossible

27  as a practical matter for the defense to do so before the upcoming trial.  Scanning or
    photocopying only the 1,700 boxes of paper documents, which are housed at the FDA Field

28  Office in San Clemente, is likely to take months,

A/76226439.2

1    In light of the above, Ms. Omidi respectfully asks this Court to compel the

2    government to comply with its constitutional discovery obligations by reviewing

3    the evidence in its possession for <u>Brady</u> material and disclosing all such material

4    *prior to* the scheduled trial in this case.  The government's complaint that it is

5    simply impossible for it to do so because of the volume of evidence – a complaint

6    that was raised and rejected in <u>Salyer</u> – should not excuse the government's

7    performance of its obligations or shift its burden to the defense, particularly

8    because the government's present situation is one entirely of its own making.  It is

9    the government that chose to seal the simple indictment in this case when it was

10   returned in October 2013 and not to unseal it until the government had seized

11   billions of pages of potentially relevant and exculpatory documents.  It is the

12   government that chose to execute search warrants on multiple locations and to

13   seize an inordinately immense volume of documents that it would be obligated to

14   review and disclose prior to trial.[8]  It is the government that further chose to arrest

15   Ms. Omidi, unseal the indictment, and start the speedy trial clock running on the

16   same day that it executed those searches.  Most importantly, it is the government

17   that has the constitutional duty to ensure a fair trial by reviewing and disclosing all

18   exculpatory information in its possession prior to – a duty with which the

19   government could easily have complied had it proceeded with this case when the

20   indictment was returned, *before* seizing billions of pages that it would then be

21   obligated to review.

22

23

24
     _____

25   [8] The *Salyer* court noted that "[w]hen asked at [the] hearing why the government would seek so
     much information, the [government's] response, pared to its essence, was 'because we can.'"
26   *Salyer*, 2010 WL 3036444 at *3.  In light of the government's seizure of 100 terabytes of
     electronic information and an additional 1,700 boxes of paper documents in a relatively run-of-
27   the-mill healthcare- and tax-fraud investigation, the "because we can" philosophy appears to
     control the prosecution here as well.
28

27

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

1

## IV.    CONCLUSION

For the foregoing reasons, Ms. Omidi respectfully requests that this Court compel production of discovery as requested herein.

DATED:  July 1, 2014                    Respectfully submitted,

BINGHAM MCCUTCHEN LLP
Nathan J. Hochman
Daniel A. Saunders

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer


By:    /S/ Nathan J. Hochman
        Nathan J. Hochman
        Attorneys for Defendant
        Cindy Omidi

28

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2

## DECLARATION OF MATTHEW D. UMHOFER

I, Matthew D. Umhofer, declare as follows:

1.     I am an attorney duly licensed to practice law in the Central District of California, and I am counsel for Defendant Ms. Cindy Omidi in the above-captioned case.  I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.     On June 27, 2014, pursuant to Local Rule 7-3, Daniel Saunders, Luke Kuo, and I—attorneys for Defendant Ms. Omidi—engaged in a telephonic meet-and-confer session with attorneys for the government, Assistant United States Attorneys Evan Davis and David Kirman ("the Government").

3.     During the meet-and-confer session, the Government expressly declined to make a representation that there is no *Brady* or *Giglio* material contained in the 100 terabytes of electronic data and 1,700 boxes of documents seized from Ms. Omidi and others on June 4, 2014.

4.     Attached hereto as Exhibit A is a true and correct copy of the E-mail exchange between Samanta Kelley and Victoria Martin.

5.     Attached hereto as Exhibit B is a true and correct copy of the letter from Victoria Martin to AUSA David Kirman, dated November 5, 2012.

6.     Attached hereto as Exhibit C is a true and correct copy of Docket Number 2, Ex Parte Application to Seal Indictment, Attached AUSA David Kirman Declaration.

7.     Attached hereto as Exhibit D is a true and correct copy of the Affidavit of Samanta Kelley in Support of Complaint Against Tiffiny Burrows, dated June 8, 2012.

8.     Attached hereto as Exhibit E is a true and correct copy of the E-mail exchange involving Eugene Seffert ("Seffert E-mail"), dated October 10-16, 2013.

29

MOTION TO COMPEL DISCOVERY CR 13-379-SVW

A/76226439.2

9.      Attached hereto as Exhibit F is a true and correct copy of the Search Warrant for 1235 Sierra Alta Way, West Hollywood, conducted on June 4, 2014, in Case Number 04-1033M.

10.     Attached hereto as Exhibit G is a true and correct copy of the Search Warrant for 9001 Wilshire Blvd., Beverly Hills, Ca., conducted on June 4, 2014, in Case Number 04-1035M.

11.     Attached hereto as Exhibit H is a true and correct copy of the Search Warrant for One Wilshire Blvd., Los Angeles, conducted on June 4, 2014, in Case Number 04-1030M.

12.     Attached hereto as Exhibit I is a true and correct copy of the letter from Assistant United States Attorney Evan Davis to the defense, dated June 19, 2014.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing facts are true and correct to the best of my information and belief.

Executed this 1st day of July 2014, at Los Angeles, California.

_____

_____
Matthew Donald Umhofer

30

MOTION TO COMPEL DISCOVERY CR 13-739-SVW

A/76226439.2